I turn to the third case on the calendar, International Cards Company, L, v. Mastercard International, Inc. Mr. Cavalieri. Good morning, your honors.  My name is Damian Cavalieri from the law firm Hogue, Newman, Riegel & Kenney, representing International Cards Company, also known as ICC. I was lead counsel in the trial below. There are many issues before the court on this appeal and cross-appeal, and I will begin by focusing on the three issues on ICC's appeal. The first issue is the district court's error in dismissing ICC's breach of contract claim on the eve of trial based on an introductory sentence in Mastercard's rules, ignoring substantial portions of the agreement between the parties. The second issue is the district court's error in hearing and then granting a motion in limine, seeking to exclude parts of the agreement between the parties. And the third issue before the court on ICC's appeal is the district court's error in dismissing ICC's breach of the implied covenant of good faith and fair dealing claim as duplicative of the breach of contract claim, bless you, your honors, as it addresses different conduct during a different time period and had different damages, beginning with the breach of contract issue. The district court committed error in dismissing ICC's breach of contract claim for the following reasons. First, it did not consider the entire agreement, that is, both the license agreement, which was what was signed by ICC, and the rules, which only have import because they're incorporated into the license agreement. Now, ICC began its relationship with Mastercard in 1999. And over the course until its termination, its improper termination in April of 2013, signed several different license agreements, each superseding one another and each incorporating the rules by reference from Mastercard. But don't the rules state that if they are found to be inconsistent with a provision in the license that the rules or standards would prevail? Yes, but only if they're inconsistent. There is no inconsistency here. The precatory language in Rule 1.6.2, which is the termination by corporation provision in Mastercard's rules, has very little information in it. It simply states that Mastercard may terminate a customer. There's no qualification language. There's no description language. It is followed by eight enumerated bases for such termination. But one can refer back to the license agreement, where it has very descriptive termination provisions. There's a notice and cure provision in Section 11C of the license agreement requiring specific notice, plus 90 days to cure such notice, after which time the license may terminate it. It is important to note that the license and membership really are two sides of the same coin. The license has no effect without the membership, and the membership has no effect without the license. In fact, to participate in a Mastercard system, one needs to have a license, and that's in Rule 2.1 of Mastercard's rules. So really, they follow the same path and work in parallel. And for Mastercard to be able to avoid the protections to a licensee by simply stating, oh, we terminated your membership, is an irrational interpretation of a very broad sentence, where you have very specific language contained in the license agreement that addresses a termination provision. In fact, under Mastercard's interpretation, such language and such an interpretation would render these provisions, these protections in the license agreement, completely superfluous. They become rendered meaningless because Mastercard could only seek to terminate the membership, and by extension, the license disappears, because that is part of what is allowed in the license. But that sort of interpretation is commercially unreasonable. Now, a licensee invests substantial amounts of money to participate in the Mastercard system. They invest millions of dollars to develop the infrastructure, to develop the customer base, to develop the merchant base in order to process Mastercard transactions. To allow Mastercard to, for any reason or no reason, suddenly terminate without any prior notice, specifically the notice that is contained in the license agreement's provisions, the only agreement that is signed by the parties, mind you, would put a licensee at a completely disadvantageous position. Why would anyone sign on to this if this is what this means? So from a commercially unreasonable standpoint, it's also an improper interpretation. And, you know, one, just to note that in a New York state, New York law is clear that when interpreting multiple agreements on the same subject matter, you would interpret them so that they are consistent. It would be consistent here to allow the protections contained in the license agreement to prevail and to protect the licensee, rather than allowing Mastercard to work around them based on very general language contained in the rules to terminate for any reason or no reason. Turning to my second point, as I see my time is running low, on the motion in Limine, briefly the motion in Limine was improperly heard because it deals with what is essentially a summary judgment claim. Mastercard admits so much in their briefing on the final summary judgment motion, Director Honors, to A1608, at which time they actually claimed that that motion was directed at dismissing one of ICC's legal theories, that being the notice and cure provision contained in the license agreement. And finally, turning to the third point on ICC's appeal, that is the breach of good faith and fair dealing, it's important to note that this claim is completely distinct from the breach of contract claim. This claim started accruing back in October of 2012, six months prior to Mastercard's breach of contract. This was different facts. That is, Mastercard working with ICC's main competitor, MEPS, to deprive ICC of the benefits of the bargain it came to with Mastercard. Mastercard was working with ICC's competitors to proactively convert their merchants to MEPS. There is email record evidence demonstrating this. There is, in September of 2012, at appendix site 758, Mastercard states that supporting and migrating the majority of ICC's acquiring business to a weaker entity, MEPS. Well, didn't Mastercard have concerns about the speed with which ICC was reimbursing merchants and they were receiving complaints and also had concerns that these merchants would just opt out of the Mastercard program? Well, those merchants could have worked with MEPS or could have worked with someone else, or Mastercard could have audited and sought to audit ICC's books and records, as was their right under the rules. But why didn't they have the right to protect their business and their reputation and seek other, you know, acquirers who could? I see my time has expired. May I address Justice Matthews' question? Thank you. Because the complaints and all these issues came from MEPS. There is record evidence demonstrating that MEPS was providing all of this information. No merchants provided any evidence as to any of the Mastercard's claims. And Mastercard could have and should have worked properly within the system rather than working with ICC's competitor, in fact, acknowledging that they're moving to a separate company. And furthermore, that would be a fact question. And it should have been entitled for—a jury should have been entitled to hear Mastercard's defense and ICC's claims that Mastercard was really seeking to build up ICC's competitor because MEPS was failing and Mastercard wanted to support MEPS, even though it would deprive ICC of the benefits of its agreement with Mastercard. That doesn't make any sense. Why would they—why would Mastercard want to prop up a failing competitor if your client, as you say, was doing a bang-up job? That's counterintuitive. Well, it's not when you think about the bigger picture. Here, MEPS was a consortium of a number of regional banks, whereas ICC was a single entity, a financial services company solely located in Jordan. Mastercard sought to prop up this entity in order to, I guess, make these banks want to invest more in the Mastercard system. This would be another factual issue for a jury to decide and why dismissing it on summary judgment was improper, let alone dismissing it based on it being duplicative of the breach of contract action. Was your client making timely payments to the merchants? What does the record show in that regard? The record shows that our client was. We had testimony that we were. There were instances of some delay, but that delay could be attributed to multiple factors. Those factors include certain chargeback issues. Chargeback is where there's a challenged payment that may delay the payment to a merchant for certain fraud reasons. There are also other issues with respect to. Your position is that, by and large, your client was in full compliance? Our position is that our client was in compliance substantially with the rules and with its obligations. Your position is your client was in substantial compliance at all times? Yes. Yes, Your Honor. Thank you. Thank you. May it please the Court. Jay Fastow for Defendant MasterCard. Let me just start with the last colloquy. What ICC just didn't tell you is that they never produced the documents. They simply refused, as we went through, through Magistrate Judge Knepper and then the district court. We asked repeatedly for information about their merchant payment information, and they simply refused. The court below said that they had never made it meaningfully available. So that's the first point, is they didn't provide the information. How can they come into this court asking originally for $90 million in damages and say, we're just not going to produce core information that we repeatedly requested, that the court said it would be futile for us to ask for anymore, and they just said, no, we're not going to do it. So that's answer number one. Number two is part of what we know about this comes from what we call the late payment spreadsheets. Late payment spreadsheets were documents that they put together themselves, and they inadvertently produced to us and then tried to claw back alleging work product. And what they showed was for the month of March 2013, right before the termination, checks that they said they had and connecting those to payment times, the five business day duration. And what that showed, number one, was that they had the information. They had the information. They refused to produce us. They just wouldn't do it. And, of course, they had to have the information because an inquirer, they needed to have all the information about merchant transactions and merchant payments. They offered to produce it at their offices, did they not? And so they would make the underlying documents available for your inspection. And I believe that MasterCard had an office in that city or vicinity where they could have sent someone there to inspect, correct? Your statement is not accurate, Your Honor. What they offered was to give us roomfuls of check stubs. And what Magistrate Judge Nepern said was that wasn't making the information we were asking for meaningful available. Number one, because roomfuls of check stubs weren't meaningfully available. But number two, they weren't connecting it to the transactions. So simply having a check stub saying we paid, assuming they actually paid it, but saying we paid X dollars to this merchant on this day doesn't tell you what transaction they were paying for. And that's why we got to keep late payment spreadsheets is because Magistrate Judge Nepern said, and they never appealed this, said it wasn't meaningfully available because in the late payment spreadsheets, ICC had put all this together. They had the spreadsheets that showed the transactions, amounts, checks, related checks. But for us, they wouldn't do it. They wouldn't give us it organized in any organized way, and they wouldn't give us the payment information that would go with transactions. They also inadvertently produced some merchant transaction information. Help me understand how you extrapolate from 1.62 and from the license agreement, I guess it's section 11A, our right to terminate at any time for any reason. First, we'll start with the notice of termination, which talks about we're doing this under MasterCard Rule 1.6.2. As Your Honor raised before, the rules govern over the license agreements. And what happened was under 1.6.2, we terminated the membership, and then under Rule — Under which provision? The first sentence? The first sentence. Well, technically the first two sentences, first paragraph. It says the customer may be terminated as a customer by the corporation, period. No requirement of cause, nothing about cure, nothing about any period of notice. You just can do it for any reason. Then it says the termination is effective upon delivery, or an inability to deliver, but that doesn't matter, of written or actual notice by the corporation to the customer, which we admittedly did. We gave them notice. And so that's really the end of it. Then it goes on to say the corporation may at its discretion affect the termination without notice if, and then you've got these paragraphs that follow. And that's irrelevant because we terminated with notice. We gave them the notice. Those eight subsections relate to circumstances in which you want to terminate even before you gave notice, that there's some exigency that we have to cut this off even before we have the opportunity to provide the notice. Do you want to address the argument, though, that the district court's reading of 1.6.2 renders meaningless the license terms for termination? First of all, under Rule 2.13, when the membership was terminated, the license agreements are automatically terminated. So they can argue about the license agreements, but the rules which govern say that each license granted to a customer is terminated effective at the time of termination of the customer's participation. So by terminating the membership under 1.6.2, that automatically also terminated the license agreements. And when they entered into the license agreements, they knew those were governed by the rules. And to the extent there's any inconsistency, the rules govern. But also, it's not, as we pointed out in our brief, irrelevant because, for example, they had licenses for Jordan and for Palestine. Theoretically, we could have terminated for some reason saying, we don't want you doing business in Palestine anymore, but you can continue in Jordan. Or they may have had licenses for different brands.  Hypothetically, you could say, we're okay with you continuing to do business under the Maestro brand, but not under the MasterCard brand. So there are lots of scenarios where you could have that kind of a situation. The bottom line, they entered into the membership knowing that the rules govern. The rules provide that they could be unconditionally terminated, and they were. And that's why they can't argue, even if you read their briefs, their argument, they don't try to argue the first paragraph of 1.6.2. They go to, let's talk about the license agreement, but the license agreement was terminated. They say, let's talk about the second paragraph, but the second paragraph is actually worse for them because those are circumstances where termination can be affected even without notice. And one other point I'll mention is Rule 1.6.1 deals with termination by a member, where the member says, I want to terminate. And what that says is you have to give notice to MasterCard. But in that case- Do you allege you gave notice? Pardon? Do you allege that you gave notice? Not only do we allege, but they admitted it, that we gave notice to the CEO of ICC on April 2, 2013, and they've conceded that. You didn't give an opportunity to cure, correct? Well, Your Honor, we gave them lots of warnings. As you see in our briefs, we started giving them formal warnings as far back as almost a year before. April 22, 2012, we gave them formal warning. Then in November, we gave them notices of assessments which said, you know, shape up or may have an issue. So we gave them warnings, formal warnings, over the course of a year, and there were conversations, there were discussions, and so forth. So they had plenty of warning. And notice in 1.6.2, it's a document, it's not a time period. It's delivery of notice, and they admit we did that. Let me just turn quickly to the implied covenant argument, which they spend a lot of time on. First of all, that fails because of ICC's failure to perform its obligations. And they can say what they like, but the record on summary judgment was bereft of evidence of their performance, and it should have been even more bereft because they should have been precluded from putting in any evidence on merchant payment information because they simply refused to produce the documents that we asked for. Second, there's no evidence of damages to the extent they're now saying that the implied covenant deals with pre-termination conduct. They have no evidence of damages for that. The only evidence they have in the O'Neill report is of claim damages as of the termination for the termination. They have nothing else. The district court said, well, I find that the injuries for the implied covenant and the termination are the same. So the district court dismissed this on the grounds that it was an overlapping claim, the same claim. And that was correct. Or you could look at it the other way and say, well, if you want to call it a separate claim, it's a separate claim for pre-termination conduct, but it has no damages to it. So you dismiss it on that ground. Any way you look at it, they should lose this. And then we have the question of what they're trying to do is create rights for themselves beyond the contract. They admit they have no exclusivity rights. They have no right to complain that MEPS was in the business. They have no right to complain that MEPS was being allegedly assisted by MasterCard, especially when we know what we know about ICC's merchant issues and dissatisfaction, the serious dissatisfaction with merchants to the point that we have evidence of the record that says there were signs saying we don't take MasterCard. So their view is, well, MasterCard should just take it. Well, that's not what the implied covenant is about. Any other questions? Thank you. Thank you. Thank you, Your Honors. Briefly, there are a number of issues that we need to address, primarily the discovery issues that Mr. Fastow mischaracterized. First, with respect to, as Judge Matsumoto, as you pointed out, ICC didn't make these documents available at their offices. We made them available as they were kept in the ordinary course of business. Before you go down and give us your views on discovery, let me just ask you again about, so there's no confusion in my own mind about the Operation 1.62. Why can't this paragraph be read, this provision be read in this way? The first paragraph has to do with termination with notice, which apparently everyone concedes there was termination with notice. Well, first, Your Honor, we don't concede that there was notice as required under the rules or under the license agreement. This was termination, which actually I think there's no testimony on the record because this argument was made just weeks before trial. But the testimony or the assertions by counsel even was that they could either terminate without letting the company know or just terminate and give them the document. I believe the termination actually occurred before ICC was provided with the letter saying that you are terminated. But that's actually beside the point. So you got a letter saying you're terminated. Right. All right. So why doesn't that comply with the first paragraph? Well, because what Your Honor has to keep in mind is the second paragraph refers to such notice or such termination without prior notice. The keyword there is prior because counsel for MasterCard consistently omits that word in describing what the second section states. That contemplates that there must be some prior notice before termination. That prior notice is not defined in the rules, yet it is contained in the license agreement. A description of what that prior notice must be, must be what is contained in section 11C of the license agreement. That is specific notice with 90 days to cure. And ICC's position is that MasterCard never provided the specific notice contained in the license agreement. And briefly to touch upon the additional issues that opposing counsel made with respect to the covenant of good faith and fair dealing, there's no argument that MasterCard could license other individuals. The issue is that MasterCard was actively seeking to deprive ICC of the benefits of the bargain it had with MasterCard. If you look at the credit agricole case, it is directly on point. This is a First Department decision stating that when this is what happens, there is still a breach of the covenant of good faith and fair dealing. I see that my time is up. If there are no further questions, we rest on our briefing for the remaining issues. Thank you very much. Thank you.